# United States District Court
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| DIDYME KALENGA and ARNOLD | § |
| BANKETE, on behalf of themselves and | § |
| all others similarly situated | § |
| | § |
| v. | §    CIVIL ACTION NO. 3:19-CV-1969-S |
| | § |
| IRVING HOLDINGS, INC. | § |

## MEMORANDUM OPINION AND ORDER

This Memorandum Opinion and Order addresses the following motions:

1) Defendant's Motion to Compel Arbitration (as to Tavandra Blocker) [ECF No. 40];

2) Defendant's Motion to Compel Arbitration (as to Ngwapitshi Ngondo, Cedrick Nzamba, Jeremy Kabange, Serge Kyungu, Lorenzo (Otoma) Openito, Bertho Beveza, Francis Kitumbu, Robert Lokio) [ECF No. 54] (together with ECF No. 40, "Motions to Compel Arbitration");

3) Renewed Motion for a Protective Order and Order Permitting Corrective Notices [ECF No. 44] ("Motion for Protective Order");

4) Plaintiffs' Motion to Strike Defendant's Motion to Compel Arbitration [ECF No. 52]; and

5) Plaintiffs' Motion to Strike Defendant's Motion to Compel Arbitration [ECF No. 60] (together with ECF No. 52, "Motions to Strike").

For the reasons below, the Court **GRANTS** the Motions to Compel Arbitration, **DENIES** the

Motion for Protective Order, and **DENIES** the Motions to Strike.

## I. BACKGROUND AND PROCEDURAL HISTORY

### A. *The Parties*

Plaintiffs Didyme Kalenga ("Plaintiff Kalenga"), Arnold Bankete ("Plaintiff Bankete"),[1]

Tavandra Blocker ("Blocker"), and eight additional paratransit drivers (Plaintiff Blocker with the

---

[1] Neither Plaintiff Kalenga nor Plaintiff Bankete are alleged to have entered into arbitration agreements with Irving Holdings.

1

eight additional paratransit drivers, together "Opt-In Drivers"[2]) (altogether "Plaintiffs"), bring this collective action under the Fair Labor Standards Act ("FLSA") against Defendant Irving Holdings, Inc. ("Irving Holdings"). Plaintiffs allege that Irving Holdings misclassified Plaintiffs and similarly situated paratransit drivers as independent contractors, thereby denying them statutory minimum wages and overtime. *See* ECF No. 12 ("Am. Compl.") at 1.

Irving Holdings is a transportation company that operates: (1) traditional taxicabs; and (2) paratransit taxicabs. ECF No. 26 ("App. to Resp.") at 1-2. Traditional taxicab drivers provide services to everyday riders who hail a cab, either over the phone or from the street. *Id.* at 1. Paratransit taxicab drivers provide services to "members of the public who are not physically able to use traditional means of public transportation." *Id.* at 2. Plaintiff Kalenga and Plaintiff Bankete bring "this action on their own behalf and on behalf of all similarly situated individuals who drive (or drove) vehicles to provide paratransit and other non-fixed route transportation services on behalf of [Irving Holdings]." Am. Compl. at 2.

## B. *Agreements Between the Parties*

### *1. Independent Contractor Agreement and Special Projects Transportation Agreement*

Before driving with Irving Holdings, each driver executes the Independent Contractor Agreement ("ICA"). App. to Resp. at 2. In the ICA, the driver acknowledges that he or she is an independent contractor and agrees to the terms of driving traditional taxicabs as an independent contractor. *Id.* at 6-17.

---

[2] Opt-In Drivers includes Ngwapitshi Ngondo, Cedrick Nzamba, Jeremy Kabange, Serge Kyungu, Lorenzo (Otoma) Openito, Bertho Beveza, Francis Kitumbu, Robert Lokio, *see* ECF No. 54 at 1, and Blocker, *see* ECF No. 40 at 1. Each of these individuals opted into the case after the Court's June 1, 2020 Memorandum Opinion and Order and are alleged by Irving Holdings to have entered binding arbitration agreements prohibiting their membership in the collective class.

Not all drivers for Irving Holdings drive paratransit taxicabs. "Before driving a paratransit taxicab, each eligible driver must submit an application and denote the days and hours he or she is available to drive." *Id.* at 2; *see, e.g., id.* at 30-31 (application to paratransit program). If accepted, the paratransit drivers are required to sign the Special Projects Transportation Agreement ("SPTA"). *See id.* at 2-3. In the SPTA, the paratransit driver acknowledges that he or she is an independent contractor who will provide paratransit taxicab services. *See id.* at 3, 32-34. The SPTA also provides in relevant part:

This Agreement constitutes the sole and only agreement of the parties hereto and supersedes any prior written or oral agreements or understandings between the parties. Any modification of the terms of this Agreement shall be in writing and executed by both parties.

*Id.* at 33. Neither the ICA nor the SPTA include arbitration provisions.

## *2. Arbitration Agreement and Acknowledgement*

As early as September 3, 2019, Irving Holdings implemented an arbitration program. Irving Holdings presented current and prospective independent contractors with the Amendment to Independent Contractor Agreement – Arbitration of Claims ("Arbitration Agreement") and a Receipt and Acknowledgment of Amendment to Independent Contractor Agreement – Arbitration of Claims ("Acknowledgement"). *See* ECF No. 38 ("App. to Suppl. Evid.") at 1-2. The Arbitration Agreement provides in pertinent part:

By this Agreement, Contractor waives the right to pursue any claim covered by this Agreement through a joint, collective or class action process in any forum, whether arbitral or judicial. As such, Contractor can pursue any Claim only in his/her capacity and behalf and not on behalf of other Company contractors. In the event a final judicial determination is made that the Class Action Waiver in this section is unenforceable and that a class or collective action may proceed despite the existence of this Agreement, the arbitrator has no authority to preside over a class or collective action, and any class or collective action may be brought solely in a court of competent jurisdiction.

3

*Id.* at 4-6. FLSA claims are explicitly covered by the Arbitration Agreement. *Id.* at 4. Moreover,

independent contractors can accept the terms of the Arbitration Agreement through their conduct

in the following ways:

> a. If Contractor receives notice of this Agreement prior to providing services at the Company, Contractor's commencement of services at the Company shall constitute acceptance.
>
> b. If Contractor receives notice of this Agreement after commencing services at the Company, Contractor's continuation of providing services at the Company constitutes acceptance if Contractor continues to provide services for at least three (3) days after receipt of the notice.

*Id.* at 4. The Acknowledgment, which Irving Holdings presented to independent contractors with

the Arbitration Agreement, states the following:

> By my signature below, I acknowledge that the Amendment to Independent Contractor Agreement – Arbitration of Claims ("Amendment") includes a mandatory company policy requiring that certain claims or disputes must be submitted to an arbitrator, rather than a judge and jury in court. I understand that by receiving the Amendment to Independent Contractor Agreement – Arbitration of Claims and providing or continuing to provide services to the Company at any time on or after this acknowledgement, I am accepting and agreeing to comply with the Amendment. I understand that the Company is also accepting and agreeing to comply with the terms of the Amendment.

*Id.* at 7.

As of June 22, 2020, 186 independent contractors for Irving Holdings, including Opt-In

Drivers,[3] had signed Acknowledgements. *See* ECF No. 37, Def. Irving Holdings, Inc.'s Suppl.

Evid. and Auth. Regarding Enforceability of Arb. Agreements ("Def's. Suppl. Evid.") at 6.

---

[3] Ngwapitshi Ngondo, *see* App. to Suppl. Evid. at 156 (signed September 7, 2019); Cedrick Nzamba, at 164 (signed September 7, 2019); Jeremy Kabange, at 95 (signed September 7, 2019); Serge Kyungu, at 114 (signed October 15, 2019); Lorenzo (Otoma) Openito, at 166 (signed September 7, 2019); Bertho Beveza, at 197 (signed September 7, 2019); Francis Kitumbu, at 111 (signed September 7, 2019); Robert Lokio, at 115 (signed September 7, 2019); Blocker, at 18 (signed December 2, 2019).

4

#### C. *Procedural History*

Plaintiff Kalenga and Plaintiff Bankete brought this action on August 16, 2019, seeking relief under the FLSA. *See* ECF No. 1 ("Compl.") at 1. On November 27, 2019, Plaintiff Kalenga and Plaintiff Bankete filed a Motion for Conditional Certification, defining the proposed class as:

All individuals who work or worked for Irving Holdings, Inc. as paratransit drivers [other than drivers performing work solely as taxicab drivers] in the State of Texas and classified as independent contractors ("Contractors") during the three (3) period[s] beginning on September 25, 2016 to present.

ECF No. 21 ("Mot. for Conditional Certification") at 3 (footnote omitted). Irving Holdings filed its opposition to the Motion for Conditional Certification on January 8, 2020, and asserted, among other arguments, that Irving Holdings had recently implemented an arbitration program pursuant to which "all . . . drivers . . . agreed to arbitrate any and all claims they have or may have against [Irving Holdings]." ECF No. 25 ("Resp. in Opp'n. to Mot. for Conditional Certification") at 13-14. Plaintiff Kalenga and Plaintiff Bankete responded by filing a motion requesting: (1) a protective order wholly invalidating any arbitration agreements between putative class members and Irving Holdings; (2) an order permitting corrective notices to individuals who signed or were provided arbitration agreements; and (3) equitable tolling of all putative class members' claims. *See* ECF No. 28 ("Mot. for Protective Order and Corrective Notice") at 3. Irving Holdings opposed the motion. *See* ECF No. 30 ("Resp. in Opp'n. to Mot. for Protective Order and Corrective Notice").

On June 1, 2020, the Court granted in part and denied in part the Motion for Conditional Certification. *See* ECF No. 32 ("Memo. Op. and Order"). The Court defined the certified class as:

All individuals who work or worked for Irving Holdings, Inc. in the Dallas Area Rapid Transit program as paratransit drivers (other than drivers performing work solely as taxicab drivers) in the State of Texas and are or were classified as

5

> independent contractors during the three (3) periods beginning on September 25,
> 2016 to present, and who did not enter into a valid arbitration agreement.

*Id.* at 19.

The Court ordered the parties to submit additional evidence before issuing notice to the certified class. *Id.* Specifically, the Court ordered Irving Holdings to "submit evidence as to each current and former paratransit driver who should not receive notice of this action because of a valid arbitration agreement." *Id.* at 6.

The Court also denied Plaintiff Kalenga and Plaintiff Bankete's Motion for a Protective Order, Equitable Tolling, and Request for Corrective Notices without prejudice "to it being reasserted once a clear record of the alleged pre-certification communication has been developed." *Id.* at 20.

Irving Holdings timely submitted supplemental evidence in support of its position that 186 paratransit drivers, including Opt-In Drivers, were bound by Arbitration Agreements. Def's. Suppl. Evid. at 6. Plaintiffs responded in opposition to Irving Holdings' supplemental evidence and renewed their motion for a protective order. *See* ECF No. 44, Pls.' Resp. to Def's. Suppl. Evid. at 3. Subsequent to the Court's Memorandum Opinion and Order, 37 paratransit drivers opted into the collective action by filing notices of consent to become party plaintiffs ("Consents"). *See* ECF Nos. 36, 39, 42-43, 45-51, 53, 57-59, 61-62.

Beginning July 3, 2020, Irving Holdings filed motions to compel arbitration as to Opt-In Drivers, each of whom had filed a Consent to join the litigation. *See* ECF No. 40, Mot. to Compel Blocker at 1; ECF No. 54, Mot. to Compel Opt-In Drivers at 1. Plaintiff Kalenga and Plaintiff Bankete filed two corresponding Motions to Strike Irving Holdings' motions to compel arbitration. *See* ECF Nos. 52 and 60, Mots. to Strike.

## II. ANALYSIS

### A. *Motions to Compel Arbitration*

If there is "a genuine dispute as to the existence or validity of an arbitration agreement, an employer that seeks to avoid a collective action, as to a particular employee, has the burden to show, by a preponderance of the evidence, the existence of a valid arbitration agreement for that employee." *In re JPMorgan Chase & Co.*, 916 F.3d 494, 502-03 (5th Cir. 2019). Determining whether a valid arbitration agreement exists and is enforceable involves two analytical steps. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016); *see also Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003). "First, the court must determine whether the parties agreed to arbitrate the dispute. Once the court finds that the parties agreed to arbitrate, it must consider whether any federal statute or policy renders the claims nonarbitrable." *Will-Drill Res.*, 352 F.3d at 214 (quotation marks omitted, citation omitted).

When considering the first question, there are two considerations. The first is contract formation—whether the parties entered into an arbitration agreement. The second is contract interpretation—whether the dispute falls within the scope of the arbitration agreement. *Id.* Absent a delegation clause, both questions are for the court to resolve. *Kubala*, 830 F.3d at 201 (citing *Will-Drill Res.*, 352 F.3d at 214). Although there is a strong federal policy favoring arbitration, this policy "does not apply to the determination of whether there is a valid agreement to arbitrate between the parties." *Will-Drill Res.*, 352 F.3d at 214 (footnote omitted). "Because the FAA is at bottom a policy guaranteeing the enforcement of private contractual arrangements, we look first to whether the parties agreed to arbitrate a dispute, not to general policy goals, to determine the scope of the agreement." *Id.* (quoting *E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002)) (quotation marks omitted).

7

## *1. Contract Formation*

When conducting a contract formation inquiry, the Court distinguishes between "validity or enforceability" challenges and "formation or existence" challenges. *Arnold v. Homeaway*, 890 F.3d 546, 550 (5th Cir. 2018) (citing *Rent-A-Ctr., West, Inc. v. Jackson*, 561 U.S. 63, 70 n.2 (2010); *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 444 n.1 (2006)). The Supreme Court has suggested that challenges that question the very existence of an agreement include "whether the alleged obligor ever signed the contract." *Id.* (quoting *Buckeye Check Cashing, Inc.*, 546 U.S. at 444 n.1). "[I]t is for the courts to decide at the outset whether an agreement was reached, applying state-law principles of contract." *Will-Drill Res.*, 352 F.3d at 218. Issues of contract validity and scope are governed by state-law contract principles. *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 301 (5th Cir. 2004).

Although the Arbitration Agreement does not contain an explicit choice-of-law provision, it refers and cites to Texas law as controlling. *See* App. to Suppl. Evid. at 5. Indeed, the parties do not dispute that Texas law governs the Arbitration Agreement and cite to Texas law in support of their relative positions. Pls.' Resp. to Def's. Suppl. Evid. at 18 (Plaintiffs citing Texas contract law); Def's. Suppl. Evid. at 14 (Irving Holdings citing Texas contract law). When parties fail to raise choice-of-law issues, the Court need not raise the issue *sua sponte* and the parties are deemed to have acquiesced to the law of the forum. *Nova Consulting Grp., Inc. v. Eng'g Consulting Servs., Ltd.*, No. Civ. SA03CA305FB, 2005 WL 2708811, at \*6 (W.D. Tex. June 3, 2005). Accordingly, the Court finds that Texas state law applies to determine whether the parties formed a valid contract.

On the issue of contract formation, the parties dispute: (1) whether the Arbitration Agreement was a valid modification, if at all, of either the ICA or the SPTA; (2) whether the absence of a commencement date invalidates the Arbitration Agreement; (3) whether there was

8

adequate consideration; and (4) whether the Arbitration Agreement should be invalidated because it was implemented after Plaintiff Kalenga and Plaintiff Bankete filed this collective action.

### a.   *Modification*

Although the Arbitration Agreement on its face indicates that it is an "amendment" to the ICA, App. to Suppl. Evid. at 4 ("Amendment to Independent Contractor Agreement – Arbitration of Claims"), Plaintiffs assert that the ICA had previously been superseded by the SPTA, Pls.' Resp. to Def's. Suppl. Evid. at 6.

A statement in a contract that the document "constitutes the entire agreement concerning the subject matter" and "supersedes prior agreements" is a merger clause. *IKON Office Sols., Inc. v. Eifert*, 125 S.W.3d 113, 125 n.6 (Tex. App. – Houston, 14th Dist. 2003, pet. denied). "Merger, with respect to the law of contracts, refers to the extinguishment of one contract by its absorption into another contract and is largely a matter of the intention of the parties." *Smith v. Smith*, 794 S.W.2d 823, 827-28 (Tex. App. – Dallas 1990, no writ). To achieve merger, the second contract must "be between the same parties as the first, must embrace the same subject matter, and must have been so intended by the parties." *Id.* at 828. In the instant case, these requirements are met. The SPTA and ICA are between the same parties—Irving Holdings and each paratransit driver. The ICA and SPTA both embrace the subject matter of the driver's duties to Irving Holdings as an independent contractor. And, the intent of the parties is clear. The SPTA explicitly "supersedes any prior written or oral agreements or understandings between the parties" and "constitutes the sole and only agreement of the parties hereto[.]" App. to Resp. at 33. Accordingly, the Court finds that the requirements for merger are met by the SPTA's merger clause.

It is undisputed that Irving Holdings required all paratransit drivers to sign both an ICA and an SPTA. *See id.* at 2 (explaining that before driving any taxicab, drivers sign an ICA and before driving a paratransit taxicab, paratransit drivers sign an SPTA). Moreover, neither party

contests that Irving Holdings first engages drivers as independent contractors, and then, if they meet certain requirements, as paratransit drivers. *See id.* at 2. The undisputed evidence corroborates that Irving Holdings requires its paratransit drivers first to sign an ICA and, thereafter, to sign an SPTA. *See, e.g.*, Decl. of Elizabeth George App. to Resp. at 2-3 ("Before driving a paratransit taxicab, each eligible driver must submit an application. . . . Further, before driving a paratransit taxicab each driver signs [an SPTA]."). Given the timing of the agreements, and the fact that the SPTA contains a valid merger clause, the Court finds that the SPTAs signed by Opt-In Drivers superseded their respective ICAs. The Court now addresses: (1) whether the Arbitration Agreement is a valid modification given that it purports to modify a superseded agreement; and (2) whether the Arbitration Agreement should be construed as a valid modification of the SPTA.

The parties have not cited any binding precedent addressing whether an amendment is valid as a matter of law when it purports to amend an agreement that has been superseded by another agreement. However, in *Texas Taco Cabana LP v. Taco Cabana of NM Inc.*, a district court addressed a similar situation in which a 2000 amendment purported to amend a 1988 development agreement, which had been previously terminated by a 1994 development agreement. No. Civ. A. SA02CV1209XR, 2005 WL 356829, at *5 (W.D. Tex. Feb. 2, 2005). In that case, the court looked to the parties' communications regarding the agreements to discern their intentions in creating the amendment. *Id.* at *6. The court noted that the parties referred to the amendment primarily as a mechanism to extend the general agreement and found that the parties created the amendment "to extend development rights, not to revive and extend a terminated development agreement [the 1988 development agreement]." *Id.*

Evidence of the parties' intentions in the present case indicates they similarly intended to modify the operative agreement. For example, in declarations by Irving Holdings' employee

10

Elizabeth George ("George"), George refers to the dissemination of the Arbitration Agreement and Acknowledgment as the rollout of Irving Holdings' "arbitration program." Def's. Suppl. Evid. at 2 (describing the Arbitration Agreement as part of "the arbitration program"). George describes the Arbitration Agreement as "the arbitration agreement," not as an amendment to the ICA and states that the Arbitration Agreement is now "part of the standard onboarding process" for new independent contractors. App. to Suppl. Evid. at 1. Although the Arbitration Agreement itself is titled as an amendment to the ICA and is referred to as an amendment in the first paragraph of the Arbitration Agreement, App. to Suppl. Evid. at 4, Irving Holdings' references to the Arbitration Agreement indicate the primary purpose was to implement an arbitration program between Irving Holdings and its independent contractors. Accordingly, the Court finds that the Arbitration Agreement is validly formed despite purporting to amend a superseded agreement, and that the Arbitration Agreement may therefore be construed as a modification of the operative agreement—the SPTA—between Irving Holdings and Opt-In Drivers.

Plaintiffs also argue that the Arbitration Agreement is not a valid modification of the SPTA because: (1) it was not signed by Irving Holdings; and (2) Opt-In Drivers' signatures on the Acknowledgments, rather than on the Arbitration Agreements themselves, do not satisfy the SPTA's modification requirements.

The SPTA states: "any modification to the terms of this Agreement shall be in writing and executed by both parties." App. to Resp. at 33. "Parties to an arbitration agreement may express their intent to require a signature as a condition precedent to the agreement's enforceability." *Wright v. Hernandez*, 469 S.W.3d 744, 758 (Tex. App. – El Paso 2015, no pet.). The SPTA, however, does not require signatures. "When there is no evidence to show that the parties intended the signing of the agreement to be a condition precedent, the evidence must still demonstrate that

11

the non-signatory party intended to be bound by the agreement." *SK Plymouth, LLC v. Simmons*, 605 S.W.3d 706, 717 (Tex. App. – Houston, 1st Dist. 2020, no pet.) (citing *Wright*, 469 S.W.3d at 760). In "determining whether an employer intended to be bound by an arbitration agreement in the absence of the employer's signature on the agreement, courts have considered various actions taken by the employer." *Wright*, 469 S.W.3d at 761. These include: the employer's "act of drafting the arbitration agreement, its actions in maintaining the agreement as a business record, and its actions in moving to enforce the agreement when the employee filed suit against it." *Id.* (internal citations omitted).

Irving Holdings did not sign the Arbitration Agreements or Acknowledgments. However, Irving Holdings manifested that it "intended to be bound" by the Arbitration Agreement by its actions. *Id.* (internal citations omitted) (employer manifested intent where it drafted arbitration agreement, maintained records of the agreement, and moved to enforce the agreement). Toward that end, Irving Holdings: (1) drafted the Arbitration Agreement, *see* Def's. Suppl. Evid. at 6; (2) maintained signed Acknowledgments from each driver as business records, App. to Suppl. Evid. at 3; and (3) moved to enforce the Arbitration Agreement in this Court, *see* Mots. to Compel.

Under Texas law, an employee's signature on a form acknowledging the agreement to arbitrate, method of acceptance, and receipt of the agreement by the signatory is an acceptance of the arbitration agreement as a matter of law. *See In re Dallas Peterbilt, Ltd., L.L.P.*, 196 S.W.3d 161, 163 (Tex. 2006). The Acknowledgments signed by Opt-In Drivers included: (1) information about the agreement to arbitrate, *see* App. to Suppl. Evid. at 13 (stating that the Arbitration Agreement includes "a mandatory company policy requiring that certain claims or disputes must be submitted to an arbitrator, rather than a judge and jury in court"); (2) the method of acceptance, *id.* ("I understand that by receiving the [Arbitration Agreement] and providing or continuing to

12

provide services to the Company at any time on or after this acknowledgment, I am accepting and agreeing to comply."); and (3) a representation that the signatory received and acknowledged the Arbitration Agreement, *id.* ("I understand that by receiving the [Arbitration Agreement] and providing or continuing to provide services to the Company at any time on or after this acknowledgement, I am accepting and agreeing to comply with the [Arbitration Agreement]."). Accordingly, the Court finds that Opt-In Drivers' signatures on the Acknowledgments satisfy the execution requirement for modification of the SPTA.

Therefore, the Court finds that the Arbitration Agreement is a valid modification to the SPTA.

### b. *Commencement Date*

The Arbitration Agreement states in Section 12: "This Agreement commences on the accepted date defined in Section 1." App. to Suppl. Evid. at 6. However, Section 1 does not include a commencement date. *Id.* at 4. Plaintiffs assert that this omission renders the Arbitration Agreement ambiguous and unenforceable. *See* Pls.' Resp. to Def's. Suppl. Evid. at 13.

To be enforceable, "an agreement must be sufficiently definite to enable a court to understand what the promisor undertook." *Shin-Con Dev. Corp. v. I.P. Invs., Ltd.*, 279 S.W.3d 759, 765 (Tex. App. – Dallas 2008, pet. denied) (citing *T.O. Stanley Boot Co., Inc. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992)). If an agreement is "so indefinite as to make it impossible for the court to determine the legal obligations of the parties, it is not an enforceable contract." *Id.* (citing *Searcy v. DDA, Inc.*, 201 S.W.3d 319, 322 (Tex. App. – Dallas 2006, no pet.)).

In *Melendez v. Hoque & Mumith, Inc.*, the court rejected the argument Plaintiffs are making here where an arbitration agreement's "effective date" section was not completed. *See* Civ. A. No. 3:12-CV-01332-L, 2012 WL 2595268, at *2-3 (N.D. Tex. July 3, 2012). In *Melendez*, the court stated that because the contract was "not a term contract," but one that clearly applied to the period

13

of time that the plaintiff was employed by the defendant, the commencement date was not essential. *Id.* In other words, despite lacking a commencement date, the agreement was "sufficiently definite" to enable the court to determine the obligations between the parties. *See Shin-Con Dev. Corp.*, 279 S.W.3d at 765.

The Court finds that the Arbitration Agreement is not "so indefinite as to make it impossible for the court to determine the legal obligations of the parties." *See id.* As in *Melendez*, it is clear that the Arbitration Agreement applies to the period of time that drivers are employed by Irving Holdings. For example, the acts of acceptance of the Arbitration Agreement are either: (1) commencement of services; or (2) continuation of services for at least three days after notice. *See* App. to Suppl. Evid. at 4. Employment, whether commenced or continued, is the event from which the "parties' duties flow[]." *Melendez*, 2012 WL 2595268 at \*2-3. The Court finds that the lack of a specific commencement date does not render the Arbitration Agreement invalid.

### c. *Consideration*

A mutual promise between an employer and an independent contractor to arbitrate disputes is sufficient consideration to support a modification of employment. *See In re Halliburton Co.*, 80 S.W.3d 566, 568 (Tex. 2002). "Though a mutual agreement to arbitrate is sufficient consideration to support an arbitration agreement, the agreement is illusory '[w]here one party has unrestrained unilateral authority to terminate its obligation to arbitrate.'" *Nelson v. Watch House Intern, L.L.C.*, 815 F.3d 190, 193 (5th Cir. 2016) (quoting *Lizalde v. Vista Quality Markets*, 746 F.3d 222, 225 (5th Cir. 2014)).

Irving Holdings retains authority to terminate its obligation in the Arbitration Agreement. *See* App. to Suppl. Evid. at 6 ("Company shall have the right to prospectively terminate and modify this Agreement."). However, retaining termination power does not make an agreement illusory so long as: (1) termination power extends only to prospective claims; (2) termination power applies

equally to both the employer's and employee's claims; and (3) advance notice to the employee is required before termination is effective. *Lizalde*, 746 F.3d at 226 (citing *Halliburton*, 80 S.W.3d at 569-70).

The Arbitration Agreement's termination and modification clause states:

Company shall have the right to prospectively terminate and modify this Agreement. However, any such Termination or Modification is not effective for Covered Claims, which accrued or occurred prior to the date of the termination. Further, any termination or modification shall not be effective until thirty (30) days after reasonable written notice is given to Contractor covered by this Agreement.

App. to Suppl. Evid. at 6. This clause: (1) extends termination power only to prospective claims; (2) applies equally to both the employer's and employee's claims; and (3) requires thirty days' advance notice to the employee before termination is effective. Accordingly, the Court finds that the Arbitration Agreement is supported by valid consideration.

### d. *Post-Suit Timing*

Plaintiffs allege that the Arbitration Agreements should not be enforced because Irving Holdings delivered the Arbitration Agreements and Acknowledgments to employees after the instant action was already filed in this Court. Plaintiffs argue that the Arbitration Agreement program "inappropriately usurped th[e] collective action" and that, on that basis alone, the Arbitration Agreements are misleading, coercive, improper and therefore unenforceable. Pls.' Resp. to Def's. Suppl. Evid. at 2-3.

Plaintiffs have not cited, and the Court has not identified, any Supreme Court, Fifth Circuit,[4] or Texas Supreme Court precedent holding that an arbitration agreement is automatically

---

[4] The Court notes that in *Kubala*, Judge Higginbotham, in his concurrence, posed a hypothetical in which he questioned the validity of an arbitration agreement where the employer, "once notified of an employee's FLSA suit, *threatens to fire the employee unless he agrees to arbitrate the suit*." 830 F.3d at 204-05 (Higginbotham, J., concurring) (emphasis added). But, unlike that hypothetical situation, the record here contains no evidence that Irving Holdings threatened to fire drivers unless they agreed to the Arbitration Agreement. Thus, the Court finds the instant case facially distinguishable from the hypothetical posed by Judge Higginbotham in his *Kubala* concurrence.

invalid because it was agreed to after a class or collective action had been filed. Only two U.S. Courts of Appeals—the Fourth Circuit and the Eleventh Circuit—have addressed this issue. In *Degidio v. Crazy Horse Saloon & Rest. Inc.*, 880 F.3d 135, 138 (4th Cir. 2018), plaintiff-employees filed an FLSA collective action against their employer. Over a year after the action was filed, the defendant-employer began entering into arbitration agreements with potential collective action plaintiffs. *Id.* at 137-38. In affirming the district court's denial of defendant's motion to compel arbitration, the Fourth Circuit acknowledged that the timing of the implementation of the arbitration agreements was relevant, but ultimately relied on other factors in making its ruling— such as: (1) misleading tactics, *see id.* at 144 (the arbitration agreements "falsely suggested that participation in the lawsuit would deprive potential plaintiffs of important professional rights"); (2) coercion, *see id.* (potential plaintiffs met with defendant's CFO and/or counsel before signing the agreement); and (3) the timing of the motion to compel arbitration, *see id.* at 141 (defendant obtained arbitration agreements, substantially invoked the judicial process, and *then* moved to compel arbitration, thereby using arbitration "as an insurance policy").

Similarly, in *Billingsley v. Citi Trends*, the Eleventh Circuit found that post-suit arbitration agreements were unenforceable where the communications regarding the arbitration agreements themselves was "confusing, misleading, [and] coercive." 560 F. App'x 914, 922 (11th Cir. 2014). Specifically, the plaintiff-employees "understood that they would be fired if they did not assent to the arbitration agreement." *Id.* at 919. Employees further testified that they "felt intimidated by the human resources representative" who presented them with the arbitration agreement. *Id.*

In both the Fourth and Eleventh Circuit cases, evidence of overtly misleading and coercive acts by the employer seeking to enforce the arbitration agreements was at the heart of the decision to affirm denial of the underlying motions to compel arbitration. Here, however, there is no such

no such evidence. While Plaintiffs submitted an affidavit by Blocker, in which she alleges that she was not informed of the pendency of the instant action before entering the Arbitration Agreement and that she believes this omission was "misleading, coercive, and designed to deprive [her] of [her] rights to join" the litigation, *see* Decl. of Blocker [ECF No. 44-1] at 1-2, these conclusory allegations pale in comparison to the evidence of misleading tactics and coercion in *Degidio*. Unlike *Degidio*, where the arbitration agreements falsely suggested that if employees lost independent contractor status by participating in the pending suit, they would lose schedule flexibility and tips, here, there is no similar evidence or indicia of coercion by Irving Holdings. *See Degidio*, 880 F.3d at 142-43. Indeed, aside from her blanket assertion of "misleading" and "coercive" conduct, Blocker alleges no specific overt acts of wrongdoing by Irving Holdings.

Plaintiffs also assert that district courts in the Fifth Circuit "routinely" invalidate post-suit arbitration agreements. Pls.' Resp. to Def's. Suppl. Evid. at 6. A review of the cases, however, reveals very few have addressed a company's provision of post-suit arbitration agreements specifically. The courts within this Circuit that have considered post-suit agreements did not wholly invalidate the underlying agreements, but instead exercised their managerial authority to regulate the communications between parties. *See, e.g.*, *Hampton Hardware, Inc. v. Cotter & Co.*, 156 F.R.D. 630, 631, 635 (N.D. Tex. 1994) (addressing letters sent to class members urging them not to participate in the class action and granting motion to limit defendant's contact with class members and prohibit further contact regarding the class action); *Williams v. Sake Hibachi Sushi & Bar, Inc.*, Civ. A. No. 3:18-CV-0517-D, 2018 WL 4539114, at *1, *6 (N.D. Tex. Sept. 21, 2018) (addressing settlement agreements releasing employers from liability disseminated after class action was initiated and ordering corrective notices be sent to putative class members who were solicited to sign settlement agreements); *Belt v. Emcare, Inc.*, 299 F. Supp. 2d 664, 665-66 (E.D.

Tex. 2003) (addressing letters containing misrepresentations about the pending class action and discouraging participation, and enjoining defendants from further communications, imposing sanctions, and ordering corrective notices).

At least one district court in the Fifth Circuit has approved post-suit arbitration agreements in circumstances similar to those here. *See Norton v. Tucker Entertainment, LLC*, Civ. A. No. 3:14-CV-1490-G, 2014 WL 5023654, at \*1, \*4 (N.D. Tex. Oct. 8, 2014). In *Norton*, the plaintiff filed an FLSA complaint and thereafter entered into an agreement with the defendant that contained an arbitration clause. *Id.* The court found the arbitration clause applied to the plaintiff's FLSA case and, accordingly, compelled arbitration. *Id.* at \*5. In doing so, the court concluded "it would be ill-advised to distinguish between pending and non-pending claims when applying the arbitration clause." *Id.* at \*4. The court further noted that the Federal Arbitration Act ("FAA") does not distinguish between pending and non-pending controversies, and states that courts "rigorously enforce agreements to arbitrate." *Id.*; *see also D.R. Horton, Inc. v. N.L.R.B.*, 737 F.3d 344, 360 (5th Cir. 2013) (noting that the FAA establishes "a liberal federal policy favoring arbitration agreements") (quoting *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011)). The Court similarly declines to "distinguish between pending and non-pending claims" in this case. *Id.* at \*4.

Accordingly, the Court finds that the Arbitration Agreements are valid notwithstanding being executed after Plaintiff Kalenga and Plaintiff Bankete initiated this lawsuit and that Irving Holdings has met its burden by a preponderance of the evidence to show valid formation of the Arbitration Agreements.

## 2. *Contract Interpretation*

The second step for the Court in determining if there is a valid arbitration agreement is contract interpretation—whether the dispute falls within the scope of the arbitration agreement, or,

in other words, the arbitrability of the dispute. *See Kubala*, 830 F.3d at 201. The threshold question in such analysis is whether the arbitrator or the court determines the arbitrability of the dispute. In the Fifth Circuit, a valid delegation clause in an arbitration agreement may require the Court to refer a dispute to arbitration to decide "gateway" arbitrability issues, including interpreting the contract to determine whether the parties' agreement covers the particular dispute. *Id.* at 202; *see also, Rent-A-Ctr.*, 561 U.S. at 68-69. The Arbitration Agreement contains a delegation clause, which states:

> The arbitrator selected under this Agreement shall have the exclusive authority to resolve any dispute relating to the interpretation, applicability, or enforceability of this agreement. *Regardless of any other statement in this Agreement and/or any dispute resolution provider's rules or procedures, any dispute relating to the interpretation, applicability, or enforceability of the Class Action Waiver in Section 6(d) of this Agreement, or any dispute otherwise relating to whether this Agreement precludes a **class or collective action** proceeding, may only be determined by a court and not an arbitrator.*

App. to Suppl. Evid. at 4-5. (emphasis added). Despite the presence of a general delegation clause, the parties have specifically agreed that any question as to the interpretation or arbitrability of a collective or class action "may only be determined by a court and not an arbitrator." *Id.*; *see also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 158 (2012) ("If there is a conflict between a general provision and a specific provision, the specific provision prevails.").

The instant dispute is a collective action. Am. Compl. at 1. FLSA claims are "covered claims" subject to arbitration per the Arbitration Agreement. App. to Suppl. Evid. at 5. The Arbitration Agreement defines "covered claims" as "any and all claims included or described in paragraph 6(a)." Paragraph 6(a) provides in relevant part: "This Agreement covers all claims and causes of action arising under federal and state employment laws" including, but not limited to,

19

"the Fair Labor Standards Act." *Id.* at 4. Further, the class action waiver provision of the Arbitration Agreement explicitly requires that parties arbitrate collective claims. *Id.* at 5. Accordingly, the Court finds that the instant dispute is within the scope of the Arbitration Agreement and is therefore to be decided by "a court and not an arbitrator." App. to Suppl. Evid. at 4-5.

### *3.* *Federal Statute or Policy*

The Fifth Circuit has stated that "nothing in the FLSA's text or legislative history" supports any assertion that the FLSA precludes arbitration. *Carter v. Countrywide Credit Indus.*, 362 F.3d 294, 297 (5th Cir. 2004). The parties do not dispute this issue. Accordingly, the Court finds that no federal statute or policy renders this claim nonarbitrable for policy reasons.

Having determined that the parties agreed to arbitrate the dispute and that no federal statute or policy renders the claim nonarbitrable, *see Will-Drill Res.*, 352 F.3d at 214, the Court grants Irving Holdings' Motions to Compel Arbitration as to Opt-In Drivers.

### **B.** *Renewed Motion for Protective Order and Order Permitting Corrective Notices*

#### *1.* *Protective Order*

Plaintiff Kalenga and Plaintiff Bankete request that the Court enter a protective order wholly invalidating and prohibiting the Arbitration Agreements because Irving Holdings implemented the arbitration program after Plaintiff Kalenga and Plaintiff Bankete filed this lawsuit. Mot. for Protective Order at 3. For the reasons stated in the Court's analysis of this issue regarding the Motions to Compel Arbitration, the Court denies the request for a protective order invalidating the Arbitration Agreements.

#### *2. Corrective Notice*

Courts have authority to govern the conduct of counsel and parties in collective FLSA actions. *See Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 171 (1989). Courts may also

20

regulate communications between a party and putative class members that are "misleading, coercive, or an attempt to undermine the collective action." *Williams*, 2018 WL 4539114 at *2 (quoting *Belt*, 299 F. Supp. 2d at 667-68). A court's discretion to do so, however, is "not unlimited." *Id.* (quoting *Gulf Oil Co. v. Bernard*, 453 U.S. 89, 100 (1981)).

Courts apply a two-part test to determine whether to issue an order impacting a party's speech with putative class members. *See Vogt v. Texas Instruments Inc.*, Civ. A. No. 3:05-CV-2244-L, 2006 WL 4660133, at *3 (N.D. Tex. Aug. 8, 2006) (citing *Belt*, 299 F. Supp. 2d at 668). A court first determines "whether there is a need for a limitation on speech, and does so by determining whether the party's speech is 'misleading, coercive, or an attempt to undermine the collective action.'" *Id.* (quoting *Belt*, 299 F. Supp. 2d at 668). If a court finds a basis for restricting speech, the court should then "tailor appropriate injunctions and sanctions in light of First Amendment concerns." *Id.*

The parties here do not allege, and the Court's review of the record does not indicate, that either the content of the Arbitration Agreements or the communications surrounding the Arbitration Agreements was coercive. *Cf. Hampton Hardware, Inc. v. Cotter & Co., Inc.*, 156 F.R.D. 630, 632 (N.D. Tex. 1994) (ordering corrective notices after finding communications discouraging class members from participating in pending case were coercive). Plaintiff Kalenga and Plaintiff Bankete filed this collective action on August 16, 2019. *See* Compl. Irving Holdings concedes that Arbitration Agreements were presented to Opt-In Drivers as early as September 3, 2019. *See* App. to Suppl. Evid. at 2. Plaintiffs assert that the timing of the post-suit communications by Irving Holdings is suspect as it began three weeks after Plaintiff Kalenga and Plaintiff Bankete filed the collective action. However, in those instances where courts have found that the timing of post-suit communications was indicative of an intent to undermine a pending

21

action, there was also the added element of misleading and coercive communications, which the Court finds is absent here. *See, e.g.*, *Williams*, 2019 WL 4539114, at \*3-4 (settlement agreements were misleading for failure to disclose pending actions and remedies available at law and coercive for failure to provide accurate, impartial information to current employees); *Belt*, 299 F. Supp. 2d at 669 (letter from employer was coercive because it preyed upon fears and concerns of employees and suggested that joining the pending action could affect their employment). Given the lack of any misleading or coercive content in the Arbitration Agreements, the Court finds that the timing of the Arbitration Agreements alone is not a sufficient basis for restricting Irving Holdings' speech. Accordingly, the Court denies the motion for corrective notice.

## C. *Motions to Strike*

In its June 1, 2020 Memorandum Opinion and Order, this Court ordered Irving Holdings "to submit evidence and briefing demonstrating each potential opt-in plaintiff who should not receive notice because of a valid arbitration agreement by June 22, 2020" and ordered Plaintiffs to "file their Response within two weeks of the filing of the additional evidence." Memo. Op. and Order at 19. The Court stated that "[n]o replies will be permitted." *Id.* Citing the Court's order that no replies would be permitted and construing Irving Holdings' Motions to Compel Arbitration as replies, Plaintiff Kalenga and Plaintiff Bankete move to strike the Motions to Compel Arbitration as "duplicative and in contravention of the briefing process ordered" by the Court. ECF No. 52 at 1.

The Court finds that the Motions to Compel Arbitration are not "replies" in contravention of its Order. Since this litigation began, 37 drivers have filed Consents to join the collective action. *See* ECF Nos. 36, 39, 42-43, 45-51, 53, 57-59, 61-62. The Court cannot *sua sponte* order claims to arbitration. *M & B Assoc., Inc. v. Wells Fargo Bank, N.A.*, No. 07-10-0446-CV, 2011 WL 1458169, at \*1 (Tex. App. – Amarillo, April 15, 2011) ("To compel arbitration, a party must apply

22

to the court for it."); *see also Spriggs v. Hancock Holding Co. Severance Pay Plan*, Civ. A. No. 18-729-SDD-RLB, 2020 WL 364122, at *6 (M.D. La. Jan. 22, 2020) (noting that the FAA "does not include language allowing courts to *sua sponte* compel arbitration"). It is not unreasonable or "unnecessary" for Irving Holdings to file these motions to enforce its perceived right to arbitration. The Court denies the Motions to Strike.

## III. CONCLUSION

For the reasons above, the Court **GRANTS** the Motion to Compel Arbitration (as to Tavandra Blocker) [ECF No. 40] and **GRANTS** the Motion to Compel Arbitration (as to Ngwapitshi Ngondo, Cedrick Nzamba, Jeremy Kabange, Serge Kyungu, Lorenzo (Otoma) Openito, Bertho Beveza, Francis Kitumbu, and Robert Lokio) [ECF No. 54]. The Court **DENIES** the Motion for Protective Order and Order Permitting Corrective Notices [ECF No. 44]. The Court **DENIES** the Motion to Strike Defendant's Motion to Compel Arbitration [ECF No. 52] and **DENIES** the Motion to Strike Defendant's Motion to Compel Arbitration [ECF No. 60].

**SO ORDERED.**

SIGNED December 20, 2020.

**KAREN GREN SCHOLER**
**UNITED STATES DISTRICT JUDGE**